Norma G. **KENNEDY**, Plaintiff,

v.

Margaret M. **HECKLER**, Secretary, United States Department of Health and Human Services, Defendant.

No. ST–C–84–51.

United States District Court,
W.D. North Carolina,
Statesville Division.

Feb. 8, 1985.

James W. Partin, Elkin, N.C., for plaintiff.

Clifford C. Marshall, Asst. U.S. Atty., Asheville, N.C., for defendant.

## ORDER

McMILLAN, District Judge.

Plaintiff Norma Kennedy was born on November 8, 1932 and has a college education. Over the past fifteen years she has worked as a teacher, cashier, cook, encyclopedia salesperson, census-taker, child-care worker and, for two months in 1980, as a filleter, later demoted to a janitorial worker, at a chicken factory. On June 2, 1982, she filed an application for disability insurance benefits alleging disability due to "bad nerves," with an onset date of August 15, 1980. That application was denied on August 31, 1982. Plaintiff did not appeal. She filed a new application on December 30, 1982, alleging disability due to "mental condition, manic depressive, psychotic," with the same onset date of August 15, 1980.

After initial administrative denials, a hearing was held by an Administrative Law Judge (ALJ) who, on October 27, 1983, found that:

Although claimant does have a severe psychiatric impairment, it is controlled with the use of medication and has not remained at such level of severity as to significantly limit or restrict her ability to perform basic work-related functions for the minimum statutory period of twelve continuous months.

After a final decision by the Appeals Council, issued January 23, 1984, plaintiff filed this complaint pursuant to 42 U.S.C. § 405(g) for review of the Secretary's decision. Both parties have filed motions for summary judgment.

The ALJ, in making his decision, had the following evidence before him:

Plaintiff has a history of psychiatric problems, beginning soon after the birth of her fourth and youngest child in 1965. She had two admissions to Broughton State Hospital in the 1960's. In July, 1977, she was first treated at New River Mental Health Center by Dr. Martha Warrick who described her as "very angry," and as having a "thought disorder." "Although she is fairly intact, I feel that with a little stress of pressure she could have a [sic] overt psychosis" (Tr. 221). In late August, 1977, she was involuntarily committed to Broughton State Hospital and diagnosed as manic-depressive. She was discharged by a court ten days later (Tr. 142). The next reports from Dr. Warrick were in October, 1978, where plaintiff appeared "very upset and agitated ... Norma is getting psychotic again, apparently going into a manic high." Plaintiff agreed to stop drinking and begin taking the anti-psychotic medicine prescribed to her. Five days later she appeared "much more stabilized, at least superficially...." (Tr. 227).

Plaintiff then worked for approximately a year, from 1978 to 1979, as a CETA worker; for six weeks in the spring of 1979 as a census-taker; and for two months in the fall of 1979 at a day care center. She was fired from that job because her medication made her "not alert" (Tr. 35). Her last job to date was from June to August, 1980, at a chicken factory where she began filleting chicken but was soon demoted to doing "housework" because her medicine made her too slow to meet production stan-

dards. When asked at the hearing why she had left the "housework" job, she first insisted that it was "just sort of personal," but later admitted that when she was called into the manager's office because of complaints that she was bothering other workers, she got angry because they were making accusations and quit (Tr. 32–34).

Plaintiff was again involuntarily committed to Broughton Hospital in March, 1982. This commitment followed a period of approximately four months of increasing hostility and aberrant behavior witnessed by plaintiff's daughter and sister and recorded in the commitment records (Tr. 142, 64, 72). Plaintiff testified that she began to hear voices, increasingly was consumed with "religious thoughts" and began to believe that she should drink beer instead of take her medication (Tr. 48). As she stopped taking her medication and began drinking, she was eventually evicted from her house and finally committed after she allegedly went outside naked and assaulted a child (Tr. 67).

Plaintiff's diagnosis during the March through May, 1982, commitment, was schizophrenia, chronic undifferentiated type with acute exacerbation (Tr. 150). In May she was discharged to a residential half-way house program where she lived for a year before moving into housing for the handicapped (Tr. 170, 45, 31). During that commitment, her medication was changed from mellaril to stellazine and thorazine. Upon release, her daily dosage was 50 mg.; it eventually was reduced to 10 mg. per day by the time of the hearing (Tr. 75, 190).

Dr. W.L. Bundy, plaintiff's treating psychiatrist, diagnosed her as being in an agitated paranoid state in March, 1982 (Tr. 153). In June, 1982, after discharge from Broughton, she was said to be "stable at this time on her present program," which included living in a half-way house, receiving out-patient therapy from New River Mental Health Center and taking 40 to 50 mg. of stellazine daily (Tr. 202). On July 17, 1982, Bill McCachien, a social worker, opined, in a statement onto which Dr. Bundy signed, that plaintiff was not capable of obtaining or maintaining gainful employment (Tr. 201). In July, 1982, in a report to the Social Security Administration, Dr. Bundy described the schizophrenia as in remission and plaintiff as oriented and competent (Tr. 207). A supervisor at the mental health center, in December, 1982, said that plaintiff was stabilized and doing well at the time, although she "may not present as well after the holidays when fewer activities are available to her" (Tr. 190). In January, 1983, she was examined by Dr. Bundy who noted that she was dressed appropriately and taking her medications. (He noted a fine tremor of the hand). He stated, "This lady is assessed to be fairly well stabilized, although this possibly is a superficial evaluation in view of her tendency towards dramatization" (Tr. 190). He also stated that while she showed a satisfactory response to treatment, he retained a guarded prognosis for her (Tr. 215).

The final reports from the mental health center indicate that from June 1982 to July 1983, "Norma continues to remain stabilized, although she reports periods of depression at times" (Tr. 214). A September, 1983, report from Dr. Bundy revealed that he had last seen the plaintiff on June 22, 1983, and that she was "unstable with obvious depressive features.... In view of her mental status, I feel that she could not be gainfully employed or self-supporting" (Tr. 232).

The only other medical report in the record is based on a one-time consultation by Dr. W.J. Grant, a psychiatrist, in August, 1982. He found that plaintiff was appropriately dressed, fully oriented and cooperative. He diagnosed her as having a bipolar disorder currently controlled by medication (30 mg. daily of stellazine) (Tr. 209–210).

■ The ALJ's finding that plaintiff does not have a severe impairment which affects her ability to do work-related functions for twelve continuous months is not supported by substantial evidence. The ALJ appears to rely on the plaintiff's relative stabilization after her 1982 hospitalization and his own observations of her de-

meanor during the hearing to find that her illness was controlled and would not affect her work-related functions. This finding is not supported by the evidence.

From at least the time that plaintiff worked for Holly Farms in the summer of 1980, through the date of the ALJ's opinion, the evidence shows that plaintiff has not been able to hold down a job precisely *because* of conditions related to her psychiatric problems. Although there is no medical evidence that plaintiff was in active decomposition during the period claimed for disability until approximately December, 1981, the testimonial evidence is that in the summer of 1980, she was not able to handle unskilled work such as being a chicken filleter because of her "slowness" (attributable to the medication she has had to take to remain stable) and she could not handle the task of janitor because of personality-related problems.

The ALJ relied on the "fact" that the plaintiff's medication appears to control her illness. In doing so, however, the ALJ failed to take into account the testimony and medical evidence of the disabling effects of taking from ten to forty mg. of stellazine a day. Plaintiff's "stability" is clearly attributable to her heavy medication and artificially stabilized environment. There is no evidence that plaintiff can function in a normal working environment. (*See* Proposed New Listings for Mental Impairments, 12.00 E, F and G, reproduced in *Social Security Forum*, October, 1984.)

 In making his determination, the ALJ also failed to consider the final report by Dr. Bundy dated September 16, 1983, which was submitted, with the permission of the ALJ, after the hearing. In that report, as set out above, the treating psychiatrist expressly stated that plaintiff was not able to work. The opinion of the treating physician is entitled to great weight and may be disregarded only if there is persuasive contradictory evidence. *Evans v. Heckler*, 734 F.2d 1012, at 1014 (4th Cir.1984). There is *no* evidence in the record that plaintiff is capable of sustaining *any* type of work. The only conclusion concerning plaintiff's disability made by the consulting physician, Dr. Grant, was that plaintiff is "presently capable of managing her own affairs" (Tr. 210). This does not provide substantial evidence of plaintiff's ability to do substantial gainful work.

There is no substantial evidence to support the Secretary's conclusion that plaintiff does not have a severe impairment, lasting for at least twelve consecutive months, which has affected her ability to do basic work-related functions. There is no evidence in the record that plaintiff is capable of doing any substantial gainful activity. She must, therefore, be found disabled.

IT IS THEREFORE ORDERED, that the Secretary's decision denying benefits is REVERSED.